1

2

3

4

5          UNITED STATES DISTRICT COURT

6          EASTERN DISTRICT OF WASHINGTON

7   DAVID G. HOTCHKISS,

8                          Plaintiff,            NO:  12-CV-0105-TOR

9        v.                                      ORDER ON CROSS-MOTIONS FOR
                                                 SUMMARY JUDGMENT
10  CSK AUTO INC. d/b/a O'REILLY
    AUTO PARTS, et al.,

11
                         Defendants.
12

13        BEFORE THE COURT are Defendants' Motion for Summary Judgment

14  (ECF No. 69) and Plaintiff's Motion for Partial Summary Judgment (ECF No. 59).

15  These motions were heard with oral argument on January 10, 2013.  Plaintiff was

16  represented by Patrick J. Kirby.  Defendants were represented by James M.

17  Kalamon.  The Court has reviewed the briefing and the record and files herein, and

18  is fully informed.

19  //

20  //


ORDER ON SUMMARY JUDGMENT MOTIONS ~ 1

BACKGROUND

This is a sexual orientation harassment case.  Plaintiff has sued his employer, O'Reilly Auto Parts, for creating a hostile work environment, wrongfully terminating his employment, and negligently supervising and retaining the employees responsible for harassing him.  Plaintiff has also sued three of his former co-workers in their individual capacities for sexual orientation discrimination, intentional infliction of emotional distress, and common law assault.  Plaintiff further seeks to recover wages and sales commissions allegedly owed to him by O'Reilly.

Defendants have moved for summary judgment on all claims.  Plaintiff has filed a cross-motion for summary judgment on his sixth cause of action for retaliation during the re-hiring process.  As discussed below, the Court will grant summary judgment for Defendants on Plaintiff's claims for negligent supervision and retention, intentional infliction of emotional distress, assault, and unpaid sales commissions.  The Court will also dismiss Plaintiff's claims against Defendants Lewis, Huffman, and Realing under Title VII and the ADA.  All other claims will proceed to trial.

FACTS

Plaintiff David Hotchkiss ("Hotchkiss") is a Retail Service Specialist ("RSS") employed by Defendant O'Reilly Auto Parts ("O'Reilly").  Hotchkiss

began his career with O'Reilly in 2004.  From 2004 to 2006, and again from 2009 to the summer of 2010, Hotchkiss was assigned to O'Reilly retail stores in the Seattle, Washington area.  In July 2010, Hotchkiss moved across the state to Spokane and began working at an O'Reilly store in Spokane Valley.

Shortly after Hotchkiss began working in Spokane Valley, one of his subordinates, Kevin Hulme ("Hulme"), began making disparaging comments about his sexual orientation.  On one occasion, Hulme called Hotchkiss at work to inquire about his work schedule.  At some point during the call, Hulme told Hotchkiss that he "sounded like a queer on the phone."  On at least one other occasion, Hulme called Hotchkiss a "queer" and a "faggot" while the two worked together in the store.  On yet another occasion, after refusing a work assignment from Hotchkiss, Hulme stated, "What are you going to do about it, faggot?"

Hotchkiss reported these comments to his supervisor, the Store Manager, Defendant Cecil Lewis ("Lewis") on Friday, September 24, 2010.  The details of the conversation between Hotchkiss and Lewis are disputed.  Hotchkiss claims to have told Lewis that he was a homosexual, that he was being called a "queer" and a "faggot" at work, that he found these comments offensive, and that he wanted Lewis to address the problem.  O'Reilly asserts that the conversation was more generic.  Under its version of events, Hotchkiss simply told Lewis that the comments made him uncomfortable and that he wanted them to stop.  However,

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 3

both parties agree that the conversation ended with Lewis informing Hotchkiss that he would "take care of it" or that he would "handle it."

Seven days later, on October 1, 2010, Hotchkiss was assigned to work a shift with Defendant Don Realing ("Realing"). On that date, Realing was serving as the Acting Store Manager in Lewis's absence. At some point that morning, Hotchkiss informed Realing that one of his "friends" was being sexually harassed by a co-worker. Hotchkiss also sought Realing's advice about how his "friend" should handle the situation. It is unclear what advice, if any, Realing actually gave. However, Plaintiff alleges that toward the end of the conversation, Realing stated, "All faggots should be shot." Realing denies having made this statement at all.

Later that day, apparently fearful for his physical safety, Hotchkiss walked off the job. Three days later, on October 4, 2010, Hotchkiss called Lewis to explain his reasons for quitting. Toward the end of this conversation, Hotchkiss asked Lewis whether he could be transferred back to his former position at the O'Reilly store in Seattle. Lewis informed Hotchkiss that he would have to "reapply" for the position since he had walked off the job.

At some point after speaking with Lewis, Hotchkiss contacted his former manager, Dave Savelle ("Savelle") about returning to work for O'Reilly in Seattle. Savelle informed Hotchkiss that he would be pleased to have Hotchkiss return to work for him, but that Hotchkiss would need to contact O'Reilly's human

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 4

1    resources department to make the necessary arrangements.  Later, Hotchkiss called

2    Savelle's supervisor, Seattle District Manager Bob Knight ("Knight"), to inquire

3    about returning to an O'Reilly store in Seattle.  Knight likewise responded that he

4    would be pleased to rehire Hotchkiss, but that Hotchkiss would need to contact

5    O'Reilly's Western Division Human Resources Manager, Dave Vanden Bos.

6          What occurred next is disputed.  Hotchkiss asserts that he made several

7    telephone calls to Alexis Brown ("Brown"), a member of O'Reilly's human

8    resources department, asking to be rehired.  According to Hotchkiss, Brown was

9    generally non-committal and informed Hotchkiss that he would have to "reapply"

10   for a position in Seattle.  Hotchkiss further asserts that Brown eventually stopped

11   returning his calls.  Frustrated by O'Reilly's handling of the situation, Hotchkiss

12   filed a formal complaint with the Washington State Human Rights Commission

13   ("WSHRC") on December 27, 2010.

14         According to O'Reilly, Hotchkiss's interactions with its human resources

15   department were much less extensive.  By its account, Hotchkiss contacted Brown

16   about transferring to a store in Seattle, at which time Brown informed Hotchkiss

17   that he would have to formally reapply for any position he sought.  Believing that

18   he "shouldn't have to" reapply, Hotchkiss instead elected to file a formal WSHRC

19   complaint.

20

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 5

1  Following the filing of the WSHRC complaint, the parties attempted to

2  resolve the dispute.  This process culminated in Hotchkiss sending O'Reilly's

3  human resources department a letter dated August 23, 2012 requesting to be

4  rehired at a store in the Seattle area.  Shortly after receiving this letter, an O'Reilly

5  representative contacted Hotchkiss and walked him through the process of

6  submitting an online application.  Hotchkiss was subsequently extended an offer

7  and began working in a Seattle-area store on October 17, 2012.

8  DISCUSSION

9  The Court may grant summary judgment in favor of a moving party who

10  demonstrates "that there is no genuine dispute as to any material fact and that the

11  movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The

12  party moving for summary judgment bears the initial burden of showing the

13  absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

14  317, 323 (1986).  The burden then shifts to the non-moving party to identify

15  specific facts showing there is a genuine issue of material fact.  *See Anderson v.*

16  *Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The mere existence of a scintilla

17  of evidence in support of the plaintiff's position will be insufficient; there must be

18  evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.

19  For purposes of summary judgment, a fact is "material" if it might affect the

20  outcome of the suit under the governing law.  *Id.* at 248.  A dispute as to any such

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 6

1    fact is "genuine" only where the evidence is such that a reasonable jury could find

2    in favor of the non-moving party.  *Id.*  In ruling on a motion for summary

3    judgment, a court must construe the facts, as well as all rational inferences

4    therefrom, in the light most favorable to the non-moving party.  *Scott v. Harris*,

5    550 U.S. 327, 378 (2007).  Finally, the court must only consider admissible

6    evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir. 2002).

7    **A. Hostile Work Environment Claim**

8      Hotchkiss has asserted a hostile work environment claim under the

9    Washington Law Against Discrimination ("WLAD"), RCW Chapter 49.60.  To

10   establish a *prima facie* hostile work environment claim, a plaintiff must

11   demonstrate (1) unwelcome harassment; (2) that is attributable to the plaintiff's

12   membership in a protected class; (3) which affected the terms and conditions of the

13   plaintiff's employment; and (4) which can be imputed to the plaintiff's employer.

14   *Loeffelholz v. Univ. of Wash.*, 175 Wash.2d 264, 265 (2012).  In the instant motion,

15   O'Reilly asserts that Hotchkiss cannot satisfy the third and fourth elements of his

16   claim.  Each of these elements is discussed in turn below.

17     1.  <u>Altered Conditions of Employment</u>

18     To satisfy the third element of a hostile work environment claim, a plaintiff

19   must show that the harassment was sufficiently severe or pervasive to change the

20   conditions of his employment and create an abusive working environment.

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 7

1   *Loeffelholz*, 175 Wash.2d at 265.  This inquiry focuses on "the frequency and

2   severity of the discriminatory conduct; whether it is physically threatening or

3   humiliating, or a mere offensive utterance; and whether it unreasonably interferes

4   with an employee's work performance."  *Washington v. Boeing Co.*, 105 Wash.

5   App. 1, 10 (2000).  "Casual, isolated or trivial manifestations of a discriminatory

6   environment do not affect the terms or conditions of employment to a sufficiently

7   significant degree."  *Id.*

8        Here, O'Reilly argues that Hotchkiss cannot establish changed working

9   conditions based upon the four "isolated comments" made by Hulme and Realing.

10  *See* ECF No. 70 at 6; ECF No. 100 at 3-4.  In its view, these statements were

11  merely "[c]asual, isolated or trivial manifestations of discriminatory environment"

12  which could not have materially altered the terms and conditions of Hotchkiss's

13  employment.  ECF No. 70 at 6.  Although the comments were offensive, O'Reilly

14  argues, they simply "had no effect at all on Hotchkiss's employment."  ECF No. 70

15  at 7.

16       Contrary to O'Reilly's assertions, the statements made by Hulme and

17  Realing were not simply "isolated comments."  Assuming *arguendo* that these

18

19

20

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 8

1    statements numbered only four in total,[1] the record reveals that they were made in

2    relatively close proximity during the months of August and September 2010.  A

3    rational jury could find that these four particular comments, made during a span of

4    less than two months, had become "pervasive" enough to change the terms and

5    conditions of Plaintiff's employment.  *See Loeffelholz*, 175 Wash.2d at 276-77

6    (single statement directed toward homosexual employee sufficient to alter terms

7    and conditions of employment when viewed in context of prior actions toward

8    employee); *but see Davis v. Fred's Appliance, Inc.*, --- Wash. App. ---, 287 P.3d

9    51, 58 (2012) (three references to employee by the name of television character

10   "Big Gay Al" within one week insufficient to alter terms and conditions of

11   employment).

12        In addition, Hulme's comments appear to have progressively escalated in

13   severity during this timeframe.  Specifically, the evidence indicates that Hulme

14   progressed from telling Hotchkiss that he "sound[ed] like a queer on the phone," to

15   directly addressing him as a "queer" and a "faggot," to ultimately refusing a work

16   assignment and proclaiming, "What are you going to do about it, faggot?"  When

17   _____

18   [1] Hotchkiss testified during his deposition that Hulme made a "couple more"

19   similar comments, but could not recall the exact wording of these comments.  ECF

20   No. 71 at ¶ 37.

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 9

1  viewed in the light most favorable to Hotchkiss, this evidence is sufficient to

2  support a finding that Hulme's statements materially altered the terms of

3  Hotchkiss's employment and created an abusive work environment.

4        Finally, it is noteworthy that neither Lewis nor any other O'Reilly manager

5  followed up with Hotchkiss about what measures were being taken to address the

6  harassment after Hotchkiss reported it on September 24, 2010.  While it is

7  undisputed that Lewis spoke to Hulme about the harassment five days later, there

8  is no evidence that Lewis ever relayed that information to Hotchkiss.  Nor did

9  Lewis inform Hotchkiss that Hulme had agreed to stop the harassment.  Thus,

10  Hotchkiss was left to wonder what, if any, remedial action had been taken on his

11  complaint.  When Realing, the acting store manager, stated that "All faggots

12  should be shot" a few days later, Hotchkiss simply concluded that no one in

13  management "had his back."  A rational jury could find in Hotchkiss's favor from

14  this evidence.

15        2.  <u>Imputability of Harassment to the Employer (Vicarious Liability)</u>

16        With regard to the fourth element of a hostile work environment claim, there

17  are two categories of harassment which can be imputed to an employer.  *Davis*, ---

18  Wash. App. ---, 287 P.3d at 58.  In the first category is harassment committed by

19  "an owner, partner, corporate officer, or manager."  *Id.*  Once established, this type

20  of harassment is automatically imputed to the employer.  *Glasgow v. Georgia-*

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 10

*Pacific Corp.*, 103 Wash.2d 401, 407 (1985).  In the second category is harassment committed by lower-level supervisors and co-workers.  *Davis*, --- Wash. App. ---, 287 P.3d at 58-59.  This latter type of harassment can be imputed to the employer only if the employer (1) authorized, knew of, or should have known of the harassment; and (2) failed to take reasonably prompt and adequate corrective action.  *Id.*  The purpose of maintaining these two categories of harassment is to "distinguish[] between, on one hand, the class of persons so closely connected to the corporate management that their actions automatically may be imputed to the employer and, on the other hand, the employee's supervisors and co-workers whose actions alone may not be imputed directly to the employer."  *Francom v. Costco Wholesale Corp.*, 98 Wash. App. 845, 853-54 (2000).

O'Reilly asserts, as an initial matter, that Realing does not qualify as "an owner, partner, corporate officer, or manager" for purposes of establishing automatic employer liability.  *Davis v. Fred's Appliance, Inc.*, --- Wash. App. ---, 287 P.3d at 58.  The Court agrees.  Whether a person qualifies an owner, partner, corporate officer or manager "depends on whether the alleged harasser is of a high enough level to be considered as the employer's 'alter ego.'"  *Boeing*, 105 Wash. App. at 11; *Francom*, 98 Wash. App. at 854-56.  Realing, as the Assistant Store Manager (and in Lewis's occasional absences, the Acting Store Manager), was not sufficiently advanced in O'Reilly's corporate hierarchy to be considered the

1    company's alter ego.  No rational jury could find otherwise.  Accordingly,

2    Realing's alleged harassment cannot automatically be imputed to O'Reilly.

3         Next, O'Reilly argues that liability for the harassment cannot be imputed

4    because it took reasonably prompt and adequate corrective action in response to

5    Hotchkiss's complaints about the harassment.  On this point, there remains a

6    genuine issue of material fact for trial.  As an initial matter, Lewis did not discuss

7    the harassment with Hulme until five days after Hotchkiss reported it.  In addition,

8    neither Lewis nor anyone else ever followed up with Hotchkiss about what,

9    specifically, was being done to curb the harassing conduct.  Lewis's statements to

10   the effect that "I'll handle it," and "We are trying to get it handled," were

11   undoubtedly of little comfort to Hotchkiss—particularly in light of the fact that he

12   was expected to continue working with Hulme while the situation was being

13   addressed.

14        Moreover, the corrective measures which O'Reilly actually took—issuing a

15   verbal warning to Hulme, reading him a copy of the company's sexual harassment

16   policy, and making a note of the incident in his personnel file—may or may not

17   have been "reasonably effective" under the circumstances.  *See Glasgow*, 103

18   Wash.2d at 407.  Notably, the corrective measures taken by an employer must be

19   reasonably calculated to (1) dissuade the individual harasser from continuing his

20   conduct, and (2) dissuade *others* from engaging in similar harassment in the future.

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 12

1    *Perry v. Costco Wholesale, Inc.*, 123 Wash. App. 783, 793-94 (2004).  Even

2    assuming that O'Reilly's corrective measures adequately deterred Hulme from

3    engaging in further harassment, they do not appear to have had a similar deterrent

4    effect on other employees such as Realing.  Thus, a rational jury could conclude

5    that the corrective action taken by O'Reilly "was not of such nature as to have been

6    reasonably calculated to end the harassment."  *Glasgow*, 103 Wash.2d at 407.

7            3.   Applicability of "*Ellerth – Faragher*" Affirmative Defense

8            O'Reilly seeks to shield itself from vicarious liability for Hulme's and

9    Realing's conduct under the affirmative defense recognized by the United States

10   Supreme Court in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and

11   *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).  This so-called *Ellerth-*

12   *Faragher* defense has never been recognized by the Washington Supreme Court,

13   although it has been expressly adopted by Division III of the Washington Court of

14   Appeals.  *See Sangster v. Albertson's*, Inc., 99 Wash. App. 156, 163-167 (2000).

15   Hotchkiss appears to agree that the defense is available, but insists that is should

16   not be applied on these facts.  *See* ECF No. 86 at 21.  Accordingly, the Court will

17   assume for purposes of this motion that the *Ellerth-Faragher* affirmative defense

18   applies to hostile work environment claims arising under the WLAD.

19           The *Ellerth-Faragher* defense is an exception to the general rule that

20   harassment committed by a high-level manager will be automatically imputed to

1    the employer.  *See Sangster*, 99 Wash. App. at 164-65.  To qualify for the defense,

2    the employer must make a threshold showing that the affected employee has not

3    suffered any tangible adverse employment action such as discharge, demotion, or

4    undesirable reassignment in connection with the harassment.  *Ellerth*, 524 U.S. at

5    765.  Once this showing has been made, the employer may avoid vicarious liability

6    by proving (1) that it exercised reasonable care to prevent and promptly correct the

7    harassing behavior; and (2) that the employee unreasonably failed to take

8    advantage of preventative or corrective opportunities provided by the employer or

9    otherwise failed to prevent the alleged harm.  *Id.*  The policy behind this defense is

10   that an employer should be able to avoid vicarious liability "in situations where it

11   acts promptly to remedy harassment."  *Swinton v. Potomac Corp.*, 270 F.3d 794,

12   803 (9th Cir. 2001); *see also Sangster*, 99 Wash. App. at 164 (explaining that

13   defense is designed "to encourage employers to adopt anti-harassment policies").

14        Before proceeding to the merits of O'Reilly's *Ellerth-Faragher* defense, the

15   Court deems it appropriate to make two points of clarification.  First, the *Ellerth-*

16   *Faragher* defense only applies to harassment committed by an employee's

17   *supervisor*.  *See Ellerth*, 524 U.S. at 765 (employer may seek to avoid vicarious

18   liability for "misuse of supervisory authority" perpetrated by a supervisor "with

19   immediate (or successively higher) authority over the employee").  Thus, the

20   defense is not available as to harassment committed by Hulme, since Hulme was

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 14

1    Hotchkiss's subordinate.  *See* ECF No. 70 at 11.  Conversely, the defense *could*

2    apply to harassment committed by Realing, as Realing was acting as Hotchkiss's

3    direct supervisor at the time of the alleged harassment.  Contrary to Hotchkiss's

4    assertions, there is no need for the jury to decide whether Realing was a "harasser-

5    supervisor."  *See* ECF No. 86 at 23-24.

6        With these clarifications in mind, the relevant questions are (1) whether

7    O'Reilly has made a threshold showing that Hotchkiss was not subjected to any

8    tangible adverse employment action in connection with the harassment; (2)

9    whether O'Reilly exercised reasonable care to prevent and promptly correct the

10   alleged harassment by Realing; and (3) whether Hotchkiss unreasonably failed to

11   take advantage of opportunities to prevent or stop the harassment.  *Ellerth*, 524

12   U.S. at 765.  As to the first question, Hotchkiss does not contend that he was

13   subjected to tangible adverse employment action for purposes of the *Ellerth-*

14   *Faragher* affirmative defense.  Accordingly, O'Reilly has made a threshold

15   showing that the defense is available.

16       With regard to the second question, there is a genuine issue of material fact

17   concerning whether O'Reilly undertook reasonable efforts to prevent Realing's

18   alleged harassment.  As discussed above, O'Reilly does not appear to have taken

19   *any* steps to dissuade employees other than Hulme from engaging in the type of

20   harassment of which Hotchkiss complained.  Just as there is a triable issue of fact

under the second prong of the *Glasgow* vicarious liability analysis, there is a triable issue under the first prong of the *Ellerth-Faragher* defense concerning whether O'Reilly's corrective measures were reasonable.

Finally, the Court finds that a reasonable jury could find in Hotchkiss's favor on the second prong of *Ellerth-Faragher*. While it is undisputed that Hotchkiss failed to avail himself of available remedies with respect to the Realing statement, a jury must decide whether this failure was "unreasonable" under the circumstances. *See Ellerth*, 524 U.S. at 765. In light of the O'Reilly's rather lukewarm responses to Hotchkiss's prior efforts to secure its assistance in resolving a harassment issue, a reasonable jury could find that Hotchkiss acted reasonably in simply quitting his job rather than pursuing an alternative remedy. Accordingly, O'Reilly's motion for summary judgment on its *Ellerth-Faragher* affirmative defense is denied.

**B. Constructive Discharge**

Hotchkiss has asserted wrongful discharge claims under the ADA, Title VII and WLAD on a constructive discharge theory. Because Hotchkiss quit his job (as opposed to having been formally terminated), he must demonstrate as a threshold matter that he was constructively discharged. In the interest of efficiency, the Court will address constructive discharge as an issue common to Hotchkiss's

wrongful discharge claims rather than addressing the issue separately in the context of each individual claim.

Federal case law describes constructive discharge as "an employee's reasonable decision to resign because of unendurable working conditions." *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Id.* If the answer to this question is "yes," the employee may assert federal wrongful discharge claims despite the fact that he or she was not formally discharged. *Id.*

Washington case law is in accord. In Washington, constructive discharge generally involves "deliberate acts by the employer that create intolerable conditions, thus forcing the employee to quit or resign." *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wash.2d 168, 179 (2005). To prove constructive discharge under Washington law, an employee must show (1) that the employer engaged in deliberate conduct which made the employee's working conditions intolerable; (2) that a reasonable person in the employee's position would be forced to resign; (3) that the employee resigned solely because of the intolerable conditions; and (4) that the employee suffered damages. *Allstot v. Edwards*, 116 Wash. App. 424, 433 (2003); *Short v. Battle Ground Sch. Dist.*, 169 Wash. App. 188, 206 (2012). Intolerable working conditions exist where an employee is subjected to

1   "aggravating circumstances or a continuous pattern of discriminatory treatment" on

2   the part of the employer. *Allstot*, 116 Wash. App. at 433.  The relevant question is

3   whether a reasonable person, when confronted with the circumstances facing that

4   particular employee, would have felt compelled to resign. *See Short*, 169 Wash.

5   App. at 206 (employee must show that employer "made her working conditions so

6   intolerable that a reasonable person in her shoes would have felt compelled to

7   resign").

8        Further, courts applying Washington law must "presume [the] resignation is

9   voluntary and, thus, cannot give rise to a claim for constructive discharge."

10  *Townsend v. Walla Walla Sch. Dist.*, 147 Wash. App. 620, 627 (2008).  The

11  employee may rebut this presumption "by showing the resignation was prompted

12  by duress or an employer's oppressive actions." *Id.* at 627-28.  Mere subjective

13  dissatisfaction, however, is insufficient to overcome the presumption. *Id.* at 628.

14       Here, the Court finds that there are genuine issues of material fact which

15  preclude summary judgment on Hotchkiss's claims for wrongful discharge under

16  the ADA, Title VII and WLAD.  As discussed above, a reasonable jury could find

17  that Hotchkiss was subjected to a hostile work environment and that O'Reilly

18  failed to take adequate remedial action.  For many of the same reasons, a

19  reasonable jury could find that a reasonable person in Hotchkiss's position would

20  have felt compelled to resign. *See Short*, 169 Wash. App. at 206.  Among other

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 18

things, a reasonable jury could conclude from O'Reilly's failure to take more

expansive remedial measures in response to Hotchkiss's complaint—as well as its

failure to communicate with Hotchkiss about what measures were being taken—

that Hotchkiss's working conditions had become intolerable.

With regard to the merits of Hotchkiss's ADA, Title VII and WLAD claims,

the Court finds that there is sufficient evidence to send these claims to the jury.

Hotchkiss's claim under the WLAD clearly survives summary judgment, as there

is ample evidence that Hotchkiss was discriminated against on the basis of his

sexual orientation.  There is less evidence that Hotchkiss was constructively

discharged because he complained about the harassment or because he suffered

from a disability.  Nevertheless, for purpose of this motion for summary judgment

it is undisputed that Hotchkiss *did* complain about the harassment and *did* inform

O'Reilly that he suffered from the Human Immunodeficiency Virus (HIV).  At

least at this juncture, the Court cannot conclude as a matter of law that Hotchkiss's

complaints and disability did not factor into the totality of the circumstances which

made Hotchkiss's working conditions intolerable.  Accordingly, the Court will

deny O'Reilly's motion for summary judgment on these claims.  .

**C. Failure to Accommodate Claims**

Hotchkiss has asserted claims for failure to accommodate a disability under

the WLAD and ADA.  *See* Pl.'s Compl., ECF No. 1, at ¶¶ 70-74.  These claims are

1   based upon the theory that O'Reilly "failed to reasonably accommodate Hotchkiss'

2   HIV by not reducing the unnecessary stress at work created by Hulme's offensive

3   comments." ECF No. 86 at 32.  O'Reilly has moved for summary judgment on

4   these claims on the grounds that (1) Hotchkiss's disability did not substantially

5   limit his ability to perform his job; and (2) Hotchkiss never specifically requested

6   an accommodation for his disability.  ECF No. 70 at 20-22; ECF No. 100 at 12-15.

7          Both the ADA and the WLAD require an employer to reasonably

8   accommodate an employee with a disability.  To state a *prima facie* claim for

9   failure to accommodate under the ADA, a plaintiff must show that "(1) [he] is

10  disabled within the meaning of the ADA; (2) [he] is a qualified individual able to

11  perform the essential functions of the job with reasonable accommodation; and (3)

12  [he] suffered an adverse employment action because of [his] disability." *Samper v.*

13  *Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (quotation

14  and citation omitted).  The showing required under the WLAD is similar. *See*

15  *Riehl v. Foodmaker, Inc.*, 152 Wash.2d 138, 145 (2004).  To state a *prima facie*

16  claim for failure to accommodate under the WLAD, a plaintiff must show (1) that

17  he had a sensory, mental, or physical abnormality that substantially limited his or

18  her ability to perform the job; (2) that he was qualified to perform the essential

19  functions of the job in question; (3) that he gave his employer notice of the

20  abnormality and its accompanying substantial limitations; and (4) upon receiving

notice, the employer failed to affirmatively adopt measures that were available to and medically necessary to accommodate the abnormality. *Id*.

Contrary to O'Reilly's assertions, there is sufficient evidence from which a rational jury could find that Hotchkiss was unable to perform his job without a reasonable accommodation. When viewed in the light most favorable to Hotchkiss, the evidence shows that Hulme's harassing behavior caused Hotchkiss to become significantly distressed, which, in turn, adversely affected Hotchkiss's health. Hotchkiss testified that the harassment caused his T-cell count to drop, which was a dangerous event for a person with HIV. Hotchkiss Dep., ECF No. 87-1, at Tr. 113-14, 125-26, 129-30. He further testified that such an event, if not corrected immediately, would adversely impact his work performance. Hotchkiss Dep., ECF No. 87-1, at Tr. 113-14, 125-26, 129-30.

Similarly, there is evidence from which a jury could find that Hotchkiss requested an accommodation from O'Reilly. During his deposition, Hotchkiss testified that he informed Lewis that the harassment by Hulme was adversely affecting his health:

> **Q:** When you complained to Cecil Lewis about Kevin Hulme's offensive comments toward you in the Spokane store, what, if anything, did you tell Cecil about how that impacted your HIV?
>
> **A:** I told him that it was – that this is difficult because I'm reliving it all over again, that it affected my health, I mean, it's, I can't work under those conditions, I mean, it's something I cannot deal with for

1   very extended periods of time, because it could be detrimental to what
2   I've been trying to achieve as far as staying healthy.

3   **Q:** What did you tell Mr. Lewis, if anything, about the effect that
    stress has on your HIV condition?

4   **A:** Yeah, that it is hard on HIV. It is hard on your immune system.

5   Hotchkiss Dep., ECF No. 87-1, at Tr. 129.

6   While it is admittedly a very close question, a jury must decide whether this

7   conversation amounted to a request for an accommodation under the ADA or

8   WLAD. O'Reilly's motion for summary judgment on Hotchkiss's failure to

9   accommodate claims is denied.

10  **D. Retaliation Claims**

11  Hotchkiss has asserted retaliation claims under Title VII, the ADA, and the

12  WLAD. The precise factual basis for these claims is rather unclear. For purposes

13  of this motion, the Court will construe Hotchkiss's complaint to allege that

14  Defendants retaliated against him by: (1) terminating his employment after he

15  requested accommodations under the ADA and the WLAD (fourth cause of

16  action); (2) terminating his employment after he complained about being subjected

17  to a hostile work environment (fifth cause of action); (3) failing to rehire him as a

18  result of his hostile work environment complaints (sixth cause of action); and (4)

19  failing to rehire him on account of a protected disability under the ADA and the

20  WLAD (seventh cause of action). Defendants have moved for summary judgment

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 22

on each of these claims; Hotchkiss has moved for summary judgment in his favor

on his sixth cause of action only.

    1. <u>Overview of Retaliation Under Title VII, the ADA and the WLAD</u>

    Title VII of the Civil Rights Act of 1964 provides that "It shall be an

unlawful employment practice for an employer to discriminate against any of his

employees . . . because he has opposed any practice made an unlawful employment

practice by [Title VII], or because he has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under [Title

VII]."  42 U.S.C. § 2000e-3(a).  The ADA provides: "No person shall discriminate

against any individual because such individual has opposed any act or practice

made unlawful by this chapter or because such individual made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing

under this chapter." 42 U.S.C. § 12203(a).  The WLAD states: "It is an unfair

practice for any employer . . . to discriminate against any person because he or she

has opposed any practices forbidden by [WLAD], or because he or she has filed a

charge, testified, or assisted in any proceeding under [WLAD]."  R.C.W. §

49.60.210(1).

    The Ninth Circuit has recognized that the framework used to analyze Title

VII retaliation claims applies equally to the ADA and the WLAD.  *Barnett v. U.S.*

*Airlines, Inc.,* 228 F.3d 1105, 1121 (9th Cir. 2000) (adopting Title VII analysis for

the ADA), *overruled on other grounds*, 535 U.S. 391 (2002); *Stegall v. Citadel Broad. Co.,* 350 F.3d 1061, 1065 (9th Cir. 2003) (utilizing Title VII analysis for WLAD).  To establish a *prima facie* case of retaliation under this framework, a plaintiff must demonstrate: (1) that he engaged in a protected activity, (2) that he was thereafter subjected to adverse employment action, and (3) that a causal link exists between the protected activity and the adverse employment action.  *Id.*

To satisfy the adverse employment action prong, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotations omitted).  A causal link can be shown by direct evidence or inferred from circumstantial evidence such as the temporal proximity between the protected activity and the employment decision and whether the employer knew that the employee engaged in protected activities.  *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir. 1987).

If the plaintiff succeeds in establishing a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the action taken.  *See Ramirez v. Olympic Health Mgmt. Sys., Inc.,* 610 F. Supp. 2d 1266, 1284 (E.D. Wash. 2009).  If the defendant states a valid reason, the burden shifts back to the plaintiff to demonstrate that the reason was merely a

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 24

1    pretext. *Id.* Only then does a plaintiff's case survive summary judgment. *Brooks*

2    *v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

3        2. Genuine Issues of Material Fact Preclude Summary Judgment on
           Hotchkiss' Fourth Cause of Action

4

5        Hotchkiss asserts that all Defendants retaliated against him because of his

6    request for an accommodation of his disability.  The parties agree that this

7    constitutes protected activity under the ADA and WLAD, but dispute whether

8    Hotchkiss actually made such a request.  As discussed above in conjunction with

9    Hotchkiss's failure to accommodate claims, there is sufficient evidence from which

10   a rational jury could find that Hotchkiss did in fact request for an accommodation

11   for his disability.

12       Furthermore, O'Reilly has not attempted to identify any legitimate, non-

13   discriminatory reason for its adverse employment action under the burden-shifting

14   framework outlined above.  Instead, O'Reilly has simply reiterated that Hotchkiss

15   was not subject to any adverse employment action.  As noted above, however,

16   genuine issues of fact remain as to whether Hotchkiss was constructively

17   discharged.  Accordingly, Defendants are not entitled to summary judgment on this

18   claim.

19       3. Genuine Issues of Material Fact Preclude Summary Judgment on
           Hotchkiss's Fifth Cause of Action

20       In his fifth cause of action, Hotchkiss claims that Defendants retaliated

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 25

against him because he complained about Hulme's harassing comments. There is no dispute that Hotchkiss did in fact engage in this protected conduct; the only ground upon which Defendants seek summary judgment is that Hotchkiss was not subjected to adverse employment action. Once again, there is a genuine issue of material fact as to whether Hotchkiss was constructively discharged. Thus, Defendants are not entitled to summary judgment on this claim.

       4. <u>Genuine Issues of Material Fact Preclude Summary Judgment on Hotchkiss's Sixth Cause of Action</u>

Hotchkiss's sixth cause of action is based upon the theory that O'Reilly engaged in unlawful retaliation by failing to re-hire him as a result of his prior hostile work environment complaints. All parties agree that reporting sexually oriented comments and filing a discrimination charge are protected activities. Thus, the first element of the *prima facie* case is met. The second and third and elements are now at issue.

       a. *Adverse employment action.*

Hotchkiss argues that O'Reilly's refusal to process his application for a position in Seattle constitutes adverse employment action. O'Reilly, for its part, asserts that Hotchkiss could not have been subjected to adverse employment action as a matter of law because he did not formally "reapply" for a position with O'Reilly during the relevant time period. O'Reilly further asserts that Hotchkiss

1  was ultimately rehired for a position in Seattle, thereby undermining his claim of

2  adverse employment action.

3          There is general support for O'Reilly's proposition that a former employee

4  alleging retaliation on a failure to rehire theory must first establish that he

5  "reapplied" to work for the employer.  *See*, *e.g.*,  *Ruggles v. Calif. Polytechnic*

6  *State Univ.*, 797 F.2d 782, 786 (9th Cir. 1986) (stating that a plaintiff claiming

7  retaliatory failure to hire must "show that the position for which she *applied* was

8  eliminated or not available to her because of her protected activities."); *see also*

9  *Velez v. Janssen Ortho, LLC*, 467 F.3d 802, 807 (1st Cir. 2006) (holding that an

10  employer's failure to rehire employee, who only submitted an open ended letter

11  requesting "any available job," did not constitute an adverse employment action);

12  *Easterling v. Connecticut*, 356 F. Supp. 2d 103, 107 (D. Conn. 2005) (no adverse

13  action where "the undisputed facts show that [the plaintiff] failed to apply for *any*

14  job with *any* employer, let alone any other state agency . . ..") (emphasis original).

15          There is less support, however, for O'Reilly's narrow interpretation of this

16  "reapplication" requirement.  Indeed, a close reading of the relevant authorities

17  indicates that an employee alleging retaliation under Title VII need only

18  demonstrate that he made every reasonable attempt to convey to the employer his

19  interest in a *particular position*.  *See*, *e.g.*, *EEOC v. Metal Serv. Co.,* 892 F.2d 341,

20  34-49 (3d Cir. 1990) (explaining that in context of Title VII discriminatory hiring

1    "failure to formally apply for a job opening will not bar a Title VII plaintiff from

2    establishing a prima facie claim . . . as long as the plaintiff made every reasonable

3    attempt to convey his interest in the job to the employer.").  While a formal written

4    application is not necessary, general requests for any available work do not rise to

5    the level of "applying."   For example, in *Velez* the plaintiff sent only a general

6    cover letter and resume to human resources requesting "any position available."

7    *Id.* at 804.  The court granted summary judgment to the defendant, however,

8    because the plaintiff did not show "that (1) she applied for a *particular position* (2)

9    which was vacant and (3) for which she was qualified." *Id.* at 803.

10           Here, the undisputed facts show Hotchkiss expressed his interest several

11   times over a period of almost two years for a position in Seattle; that there were 34

12   vacant positions available during this time; and that he was qualified for the job.

13   Hotchkiss specifically requested an RSS position in Seattle from his former

14   supervisors, Savelle and Knight.  He also called O'Reilly Human Resources

15   Department representative, Brown, and told her directly that he wanted to be re-

16   hired in Seattle.  The investigator assigned to Hotchkiss's WSHRC complaint,

17   Gary Lewis, contacted O'Reilly's human resources department and requested the

18   same. ECF No. 61.  Ultimately, Hotchkiss filled out an online application in 2012

19   after being told to do so by HR.   A reasonable jury could infer that taking two

20

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 28

1    years to process a request to be rehired for a specific position would persuade a

2    reasonable person from voicing complaints of sexually oriented comments.

3            b. *Causal connection.*

4            A causal connection can be inferred from circumstantial evidence, such as

5    the temporal proximity between the protected activity and the employment

6    decision, and whether the employer knew that the employee engaged in protected

7    activities. *Yartzoff v. Thomas,* 809 F.2d 1371, 1376 (9th Cir. 1987). Here, the first

8    protected activity, voicing complaints based on Hotchkiss' sexual orientation,

9    occurred on September 24, 2010. The alleged adverse action, namely O'Reilly's

10   refusal to process Hotchkiss's requests for a Seattle position, began on October 4,

11   2010, when Hotchkiss was told by Lewis that he needed to "reapply." ECF 71 at

12   17. O'Reilly's failure or refusal to process Hotchkiss requests for a Seattle

13   position continued until the filing of this lawsuit. Given the severity of

14   Hotchkiss's complaints and the close connection in time, a reasonable jury could

15   infer that there is a causal connection between O'Reilly's refusal to rehire and

16   Hotchkiss's complaints. *See Dawson v. Entek Int'l*, 630 F.3d 928, 937 (9th Cir.

17   2011) (finding that the gravity of the plaintiff's complaints of sexually oriented

18   comments coupled with his discharge 48 hours later gave rise to sufficient

19   circumstantial evidence of retaliation.).

20   ///

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 29

*c.  Legitimate, non-discriminatory, non-retaliatory reasons.*

Because Hotchkiss has established a prima *facie case*, the burden of production shifts to O'Reilly to produce admissible evidence of a legitimate, non-discriminatory, non-retaliatory reason for its adverse actions.  *See Ramirez,* 610 F. Supp. 2d at 1284.  Here, O'Reilly's proffered reason for failing to rehire Hotchkiss is that it requires all individuals who wish to be rehired to fill out and submit a formal application. [2]   Hotchkiss stated in his deposition that he understood as of October 10, 2012 that he had to "reapply" to get a job in Seattle, but did not do so because he thought he "shouldn't have to."  ECF 71 at 18.  Ultimately, Hotchkiss did submit an online application in the fall of 2012 and was hired in a Seattle store in October 2012.  Even viewing this evidence in a light most favorable to Defendants, however, the Court cannot conclude as a matter of law that requiring

---

[2] In February 2011, O'Reilly offered Hotchkiss a job in Spokane at a lower wage than he was originally paid.  Hotchkiss was offered this job *without* completing any formal job application.  Previously, the Court granted O'Reilly's motion to suppress the job offer as a "settlement offer" under ER 408.   Now, however, O'Reilly uses this Court's ruling as a sword to assert that *all* employees *must* fill out a formal application to be rehired, and that because Hotchkiss did not complete the application until August of 2012, he was not retaliated against.

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 30

1    Hotchkiss to fill out a formal job application for almost two years was a legitimate

2    non-retaliatory reason to delay processing his request to be hired.

3            d.   *Pretext.*

4            Pretext can be shown "either directly by persuading the court that a

5    discriminatory reason more likely motivated the employer or indirectly by showing

6    that the employer's proffered explanation is unworthy of credence." *Chuang v.*

7    *Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir. 2000).

8    Evidence of pretext can be direct or circumstantial. *Davis v. Team Elec. Co.,* 520

9    F.3d 1080, 1091 (9th Cir.2008).  Ninth Circuit law often requires circumstantial

10   evidence of pretext to be "specific" and "substantial." *See e.g., Godwin v. Hunt*

11   *Wesson, Inc.,* 150 F.3d 1217, 1222 (9th Cir. 1998).  However, as noted in *Davis,*

12   while the Ninth Circuit often requires circumstantial evidence of pretext to be

13   "specific" and "substantial," several Ninth Circuit decisions have questioned

14   whether a lesser showing should suffice. *Id.; see also Cornwell v. Electra Cent.*

15   *Credit Union,* 439 F.3d 1018, 1030 (9th Cir. 2006) (plaintiff in Title VII case who

16   was relying on circumstantial evidence need not produce more, or better, evidence

17   than a plaintiff who relied on direct evidence); *McGinest v. GTE Service Corp.,*

18   360 F.3d 1103 (9th Cir.2004) ("circumstantial and direct evidence should be

19   treated alike").  Regardless, a "plaintiff cannot create a genuine issue of pretext to

20   survive a motion for summary judgment by relying solely on unsupported

1   speculations and allegations of discriminatory intent." *Crawford v. MCI*

2   *Worldcom Comm., Inc.,* 167 F. Supp. 2d 1128, 1135 (S.D. Cal. 2001).

3          Here, Hotchkiss asserts that requiring him to fill out a formal application

4   was merely pretext for not hiring him because O'Reilly knew of his repeated,

5   specific requests for a Seattle position and declined to communicate with him.

6   O'Reilly counters that all employees who walk off the job at O'Reilly are required

7   to submit an application.  Be that as it may, there is a genuine issue of fact as to

8   when and how Hotchkiss "applied" for a Seattle position.  Thus, the Court cannot

9   conclude as a matter of law that O'Reilly's stated reason was mere pretext.

10  Plaintiff's motion for summary judgment is denied.

11          5.  Genuine Issues of Material Fact Preclude Summary Judgment on
               Hotchkiss's Seventh Cause of Action

12          Hotchkiss asserts that O'Reilly engaged in unlawful retaliation by not

13  rehiring him because of his HIV disability and request for a reasonable

14  accommodation.  Because there are genuine issues of fact as to whether Hotchkiss

15  provided O'Reilly with notice of his HIV disability and a request for

16  accommodation, there is an issue of fact as to whether Hotchkiss engaged in the

17  protected activities under the ADA and WLAD.  Furthermore, as stated previously,

18  issues of fact remain as to whether O'Reilly's failure to process Hotchkiss's

19  request to be rehired for a Seattle position constituted an adverse employment

20

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 32

1   action and whether requiring him to reapply was a legitimate reason or merely

2   pretext.  Defendant's motion for summary judgment is denied as to this claim.

3       **E. Claims for Negligent Supervision and Negligent Retention**

4           Hotchkiss has asserted common law claims for negligent supervision and

5   negligent retention of Hulme and Realing.  To prevail on these claims, Hotchkiss

6   must prove that (1) O'Reilly either knew or should have known of the danger that

7   Hulme and Realing posed before they made their offensive comments; and (2)

8   O'Reilly's failure to properly supervise and/or terminate them was the proximate

9   cause of his injuries.  *Steinbock v. Ferry Cnty. Pub. Util. Dist. No. 1*, 165 Wash.

10  App. 479, 490 (2011); *Betty Y. v. Al-Hellou*, 98 Wash. App. 146, 149 (1999).

11  Defendants seek summary judgment on these claims on the ground that O'Reilly

12  was unaware of the danger posed by Hulme and Realing until Hotchkiss reported

13  the harassment.

14          The Court agrees.  The record is devoid of evidence that O'Reilly was either

15  aware or should have been aware of Hulme's and/or Realing's propensity to

16  sexually harass other employees prior to the date on which Hotchkiss formally

17  reported their behavior.  Contrary to Hotchkiss's assertions, O'Reilly's alleged

18  knowledge of Hulme's "reputation for violent behavior," is irrelevant.  *See* ECF

19  No. 86 at 47.  Hotchkiss has not alleged that Hulme engaged in any "violent

20  behavior" toward him, and there is no evidence that Hulme actually did so.  In the

1   absence of any evidence that Hulme or Realing made similar *offensive statements*

2   on prior occasions, Hotchkiss cannot establish that O'Reilly was negligent in

3   supervising or retaining them.  Accordingly, O'Reilly is entitled to summary

4   judgment on these claims.

5   **F.  Intentional Infliction of Emotional Distress Claim**

6           To prevail on a claim for intentional infliction of emotional distress (also

7   known as "outrage"), a plaintiff must prove the following three elements: (1)

8   extreme and outrageous conduct; (2) intentional infliction of emotional distress;

9   and (3) the actual result to the plaintiff of severe emotional distress.  *Kloepfel v.*

10  *Bokor*, 149 Wash.2d 192, 195 (2003) (citations omitted).  For purposes of the first

11  element, the conduct in question must be "so outrageous in character, and so

12  extreme in degree, as to go beyond all possible bounds of decency, and to be

13  regarded as atrocious, and utterly intolerable in a civilized community."  *Grimsby*

14  *v. Samson*, 85 Wash.2d 52, 59 (1975).  In other words, the defendant's conduct

15  must be so egregious that a "recitation of the facts to an average member of the

16  community would arouse his resentment against the actor and lead him to exclaim

17  'Outrageous!'"  *Kloepfel*, 149 Wash.2d at 196 (quotation and citation omitted).

18  Whether the defendant's conduct satisfies this standard is typically a question for

19  the jury, "but it is initially for the court to determine if reasonable minds could

20

1  differ on whether the conduct was sufficiently extreme to result in liability.

2  *Dicomes v. State*, 113 Wash.2d 612, 630 (1989).

3      Here, Plaintiff's claim is based upon O'Reilly's alleged failure to investigate

4  whether Realing had, in fact, made the comment, "All faggots should be shot."

5  ECF No. 86 at 44.  Plaintiff asserts that this "failure to properly investigate the

6  facts and circumstances as to why [he] resigned" is sufficiently extreme and

7  outrageous to satisfy the first element of an outrage claim.  ECF No. 86 at 44-45.

8      The Court disagrees.  Although the *content* of the alleged statement is

9  arguably extreme and outrageous, O'Reilly's failure to investigate whether Realing

10  *actually made* the statement is not.  Given that Plaintiff did not return to work with

11  Realing after the statement was allegedly made—and that Realing voluntarily

12  resigned a few days later—no reasonable jury could find that O'Reilly's failure to

13  investigate the circumstances surrounding the alleged statement was "so

14  outrageous in character, and so extreme in degree, as to go beyond all possible

15  bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

16  civilized community."  *Grimsby*, 85 Wash.2d at 59.  Accordingly, Defendants are

17  entitled to summary judgment on this claim.

18   **G. Assault Claim**

19      To prevail on a common law assault claim, a plaintiff must prove that the

20  defendant intentionally caused a harmful or offensive contact with the plaintiff's

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 35

1  person or caused the plaintiff imminent apprehension of such contact. *McKinney*

2  *v. City of Tukwila*, 103 Wash. App. 391, 408 (2000). Mere words alone are

3  insufficient to constitute an assault unless they are accompanied by the speaker's

4  "apparent intention and ability to carry out his threat." *Brower v. Ackerley*, 88

5  Wash. App. 87, 93 (1997) (citing Restatement (Second) of Torts § 31).

6      Here, there is no competent evidence that the Hulme and/or Realing

7  statements rose to the level of assault. Hulme's statements do not reference a

8  harmful or offensive contact at all, let alone a harmful or offensive contact with

9  Plaintiff's person. Nor is there any evidence that his statements were coupled with

10  an "apparent intention and ability" to carry out any implicit threat. *See Brower*, 88

11  Wash. App. at 93.

12      Realing's alleged statement that "All faggots should be shot," is admittedly

13  closer to an assault. Notably, however, there is no evidence that this statement was

14  directed *toward the Plaintiff*. To the contrary, Plaintiff admits that Realing

15  directed this statement toward two male customers who entered the O'Reilly's

16  store together on October 1, 2010. *See* Pl.'s Compl., ECF No. 1, at ¶ 34. In

17  addition, the statement was made (if at all) on the heels of a conversation in which

18  Plaintiff "told Defendant Realing about his problems dealing with homosexual

19  harassment at work *as a friend's dilemma* (rather than his own) in order to protect

20  his privacy." *See* Pl.'s Compl., ECF No. 1, at ¶ 34 (emphasis added). Thus, when

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 36

the evidence is viewed in its proper context, no rational jury could find that the alleged statement was intended as a threat toward Plaintiff.

Moreover, assuming *arguendo* that the statement could be construed as a veiled threat, there is simply no evidence that Realing acted with an "apparent intention and ability" to carry it out. *See Brower*, 88 Wash. App. at 93. Even a direct threat to kill, if unaccompanied by an apparent ability to act on the threat almost immediately, is not an actionable assault. *Brower*, 88 Wash. App. at 94-95. Given that Realing was not holding a gun, his statement that "All faggots should be shot" does not constitute an assault. *See* Restatement (Second) of Torts § 29 cmt. c, illus. 4 (1965) ("A threatens to shoot B and leaves the room with the express purpose of getting his revolver. A is not liable to B [in assault].").

### H. Claims Against Individual Defendants

Defendants Lewis, Huffman and Realing seek dismissal of the claims against them in their individual capacities under Title VII and the ADA. "Title VII does not provide a cause of action for damages against supervisors or fellow employees." *Holly D. v. California Inst. of Tech.*, 339 F.3d 1158, 1179 (9th Cir. 2003). Similarly, "individual defendants cannot be held personally liable for violations of the ADA." *Walsh v. Nevada Dep't of Human Res.*, 471 F.3d 1033, 1038 (9th Cir. 2006). Accordingly, Hotchkiss's Title VII and ADA claims against Defendants Lewis, Huffman and Realing are dismissed.

1    Defendant Realing also seeks dismissal of Plaintiff's WLAD claim against

2    him in his individual capacity.  Under the WLAD, "individual supervisors, along

3    with their employers, may be held liable for their discriminatory acts."  *Brown v.*

4    *Scott Paper Worldwide Co.*, 143 Wash.2d 349, 361 (2001).  In order to be held

5    personally liable, a supervisor must have acted "in the interest of [the] employer."

6    *Id.* at 358; *see also Jenkins v. Palmer*, 116 Wash. App. 671, 675 (2003) (under

7    *Brown*, "managers and supervisors may be personally liable under the WLAD

8    when acting in their employer's interest").

9    Here, there is a genuine issue of material fact as to whether Realing was

10    "acting in the interest of [his] employer" when he made the statement that "All

11    faggots should be shot."  *Brown*, 143 Wash.2d at 358.  As noted above, there is no

12    dispute that Realing was Hotchkiss's acting supervisor when the statement was

13    made.  Thus, under *Brown*, the dispositive inquiry is whether Realing *spoke* as a

14    supervisor.  Given that the statement was made in the context of Hotchkiss seeking

15    advice from Realing (albeit on behalf of someone else), a rational jury could find

16    that Realing was acting in O'Reilly's interest.  Accordingly, Realing's motion for

17    summary judgment on this claim is denied.

18    **I.  Unpaid Wages Claim**

19    Hotchkiss has sued to recover wages allegedly owed to him by O'Reilly.

20    The wages allegedly owed consist of (1) compensation for time that Hotchkiss

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 38

1  spent completing mandatory employee training during his unpaid lunch breaks;

2  and (2) sales commissions earned while Hotchkiss was employed at the Spokane

3  Valley O'Reilly store.  O'Reilly contends that Hotchkiss has failed to demonstrate

4  a triable issue of fact concerning his entitlement to either type of compensation.

5       The Court finds that Hotchkiss has presented sufficient evidence to

6  withstand summary judgment as to compensation for hours worked to complete

7  mandatory company training.  Hotchkiss has alleged that Defendant Lewis and

8  Defendant Huffman required him to complete these training hours "on his own

9  time," which Hotchkiss understood to mean during non-work hours.  Hotchkiss

10  Dep., ECF No. 72-1, at Tr. 117.  Accordingly, the fact Hotchkiss has not produced

11  "documentary" evidence of having worked these hours is not particularly

12  probative.  Hotchkiss testified during his deposition that he spent approximately 22

13  to 26 hours completing mandatory "training modules" during his unpaid lunch

14  breaks.  Hotchkiss Dep., ECF No. 72-1, at Tr. 117-19.  This testimony, while

15  perhaps self-serving, is sufficient to create a triable issue of fact as to whether

16  Hotchkiss is entitled to be compensated for these hours.

17       Conversely, there is no genuine issue of material fact as to allegedly unpaid

18  sales commissions.  Hotchkiss signed a written agreement with O'Reilly which

19  provided that sales commissions were to be paid the month following the month in

20  which they were earned, and that such commissions would only be paid in the

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 39

event that Hotchkiss was still employed by the company on the scheduled payment
date. ECF No. 110-1. By the terms of this agreement, Hotchkiss was not entitled
to payment for sales commissions earned in the month immediately preceding his
resignation in October 2010. This agreement comports with the Washington Wage
Collection Act, RCW Chapter 49.48, which permits employers to withhold or
deduct a portion of an employee's earned wages after the employee is terminated,
provided that the withholding or deduction is "[s]pecifically agreed upon orally or
in writing by the employee and employer." RCW 49.48.010(2). Accordingly, the
Court will grant summary judgment in O'Reilly's favor on this portion of
Hotchkiss's claim.[3]

_____

[3] This ruling does not preclude Hotchkiss from pursuing damages for allegedly
unpaid sales commissions in conjunction with his discrimination and retaliation
claims. In the event that Hotchkiss prevails on these claims, he is entitled to
recover the reasonable value of lost past and future earnings proximately caused by
the discrimination or retaliation. *See, e.g.*, *Martini v. Boeing Co.*, 137 Wash.2d
357, 364-72 (1999) (holding that a plaintiff prevailing on a WLAD claim may
recover past and future wages lost as a proximate result of the discrimination, even
if the plaintiff was neither terminated nor constructively discharged).

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for Partial Summary Judgment (ECF No. 59) is **DENIED**.

2. Defendants' Motion for Summary Judgment (ECF No. 69) is **GRANTED in part** and **DENIED in part**.  Plaintiff's claims for hostile work environment, wrongful discharge, failure to accommodate, unlawful retaliation and unpaid wages (training hours) will proceed to trial.  The following claims are **DISMISSED** with prejudice:

   a.  All claims against individual Defendants Lewis, Huffman, and Realing arising under Title VII and the ADA;

   b.  Negligent supervision;

   c.  Negligent retention;

   d.  Intentional infliction of emotional distress;

   e.  Assault

   f.  Unpaid wages (sales commissions).

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

   **DATED** this 22nd day of January, 2013.

*s/ Thomas O. Rice*

THOMAS O. RICE
United States District Judge

ORDER ON SUMMARY JUDGMENT MOTIONS ~ 41